(No. 37143.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEWIS MEANS, Plaintiff in Error.

*Opinion filed February 1, 1963.*

PAUL J. MILLER, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys

General, and EDWARD J. HLADIS and WILLIAM L. CARLIN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

This cause is before us on writ of error to the criminal court of Cook County to review defendant's conviction following a bench trial on the consolidated charges of rape and armed robbery for which he was sentenced to concurrent terms of 20 years and 1 to 20 years respectively. Defendant's sole allegation of error is that the proof does not establish his guilt of either offense beyond a reasonable doubt.

Consideration of defendant's contention requires a review of the testimony which is irreconcilably conflicting. The complainant testified that she was proceeding homeward from her sister's house, having gotten off a bus at the corner of 63rd and Stewart in Chicago, and was walking southward on Stewart on the east side of the street when a man came up behind her, "grabbed" her, slid a knife up her right arm to her neck and said "I am taking you back here to kill you, and don't make any noise at all. If you do, I will cut your ———— neck off."

Her assailant then took complainant to the rear of a nearby building where he shoved her up against the building at knife point, searched her, took 30c out of her pocket and $3 out of her purse, and asked her if she had more money. She told him that she did not, but that she could get more money although it would take fifteen or twenty minutes to do so. Complainant further testified that the assailant then had intercourse with her, holding a knife with a blade 6 inches long at her neck while he did so. and that she made one attempt to escape whereupon her attacker told her if she made another move, he would cut her.

Complainant told her assailant that a light had come on in a window in the building, and that a woman was

looking out the window, whereupon the assailant ceased his activities, and offered to let complainant go if she promised not to turn him in to the police. Complainant agreed, and her assailant wanted to shake hands, which they did.

Thereafter the assailant and complainant walked out to the street, the assailant said he was sorry he had done what he did, told complainant he had a good job at Kroger's at 80th and Vincennes and had a 1960 white Chrysler. Complainant further testified that her assailant gave her a telephone number, which he said was his but which actually was the Kroger store number, and said his name was Ben Foster. He pulled out his wallet to show her some identification, and she saw a Kroger button and the name "Louis" which was printed in capital letters. Complainant further testified that during the time she and her assailant were walking down the street following the intercourse, the assailant had a "handkerchief stuck under his sleeve, over his knife."

The parties walked a short distance to the apartment of a girl friend of complainant's, the apartment building being located in the same block as the building near which the attack took place; complainant testified she told her assailant that she would go in and borrow some money for him from a friend of hers while he waited outside; that she did go in the building, rang her friend's bell, tried to tell her friend what happened and finally managed to tell her that there was a man in the yard and the friend called the police to whom complainant then talked. By the time the police arrived at the apartment, her assailant had fled.

The attack occurred on the evening of March 13, 1961, shortly after 7:00 P.M. On March 27, 1961, complainant was taken to the police station by two police officers, and there identified defendant as her assailant, the identification being made from a line-up of five or six individuals.

On cross-examination complainant stated that she had

been the complainant in a rape case some four years previously in which the alleged rape was claimed to have occurred in her automobile and to have been committed by a person who "imitated" a policeman.

It was stipulated by the parties that, if a doctor who examined complainant were called to testify, he would state that he had examined a smear from the complainant and that the smear revealed the presence of sperm.

The arresting officers testified that, after talking to complainant, they examined the records at Kroger's, and then attempted to locate one Lewis Means, the defendant herein. Arrangements were eventually made with defendant's sister for him to meet the officers, which he did. The officers testified that they asked the defendant, when they picked him up, whether he had raped the girl and that he answered that he had not, but that she met him on the street, asked if he liked what he saw, took him up to her apartment where he had intercourse with her; that she asked for forty dollars as compensation, and that he gave her two dollars and then subsequently snatched the two dollars back and ran from the apartment.

Officer Harris, one of the investigating officers, admitted on cross-examination that in a conversation with defendant's sister, the officer had told the defendant's sister that the officer had heard complainant was a "bad girl", and "wasn't such a nice person", but the officer further testified that this statement was "an out and out lie" made for the purpose of enabling the officer to make arrangements to take defendant into custody. The officers further testified that at 8004 South Perry, where defendant lived, they located a white 1960 Chrysler automobile.

Defendant's testimony was that on the evening in question he lived at 8004 South Perry, and was going to visit his children; that he had been at his sister's practically all

day washing the walls and venetian blinds and had been paid $14 for his services; that while he was standing at the corner of 63rd and Stewart waiting for a bus the complainant passed by in a drizzling rain and said "If you like what you see, follow it"; that defendant followed complainant, conversed with her, and they went to her apartment which was on the first floor at 6617 Stewart; that they then had intercourse, and defendant gave complainant $4 whereupon she asked about the ten dollars he had in his hand, and he told her it didn't belong to him and that he wanted to bet it on the fight that night. Defendant also told complainant to call him the following afternoon, that his name was Ben Foster, that he showed her his wallet because she doubted his name and told her he had a 1960 white Chrysler. Defendant further testified that complainant tried to snatch the ten dollars from his hand as he went out the door and told him that "if you walk out that door, I will fix you". Defendant stated that Ben Foster was a friend of his, and that he gave complainant Foster's name so that Foster would get in touch with defendant if complainant contacted him; that defendant did not give complainant his own name and phone number and address because he had a wife and family, although he admitted that he and his wife were separated and not living together regularly. Defendant denied having a knife, or threatening the complainant in any manner, and testified that he had never previously been in jail in his life. Defendant reiterated on cross-examination his statement that complainant's apartment was on the first floor of the apartment building, and that there were two stories in the building; that the apartment in question was a small apartment on the north side of the building.

Defendant's sister testified, stating that police officer Harris and officer White talked to her about her brother, and told her that her brother was in trouble with a woman;

that officer White told her that the complainant was "definitely a prostitute", and that the witness needn't worry about her brother.

An additional witness on behalf of defendant was Eleanor Williams who lived at 8004 South Perry Street with her mother and other members of the family. This witness testified that the officers came to their homes inquiring as to the defendant and that officer White stated that the defendant was in a little trouble with a woman who was accusing him of raping her, but that officer White stated "I don't think there is too much to the case, because this woman has accused another man of the same thing," and said "We have evidence that this woman is a prostitute on 63rd Street." On cross-examination this witness admitted that when the police officers first arrived and asked if she knew Lewis Means, defendant herein, witness told them she did not know him, but the witness explains her conduct by saying that she didn't know the officers and didn't even know if they were police officers because they did not identify themselves. A further witness for the defense was Louise Thomas, who testified that she knew the complainant, that the complainant was frequently seen in taverns, and accepted drinks from both white and colored men. This witness further testified that the complainant on these occasions often left with the men who bought her drinks.

In rebuttal officer White testified that he had been in the complainant's apartment, and that it was located in a four-story apartment building on the south side of the building and on the fourth floor. This witness further testified that the defendant stated, at the time of his arrest, that the complainant's apartment was on the second floor of the building. This witness further testified that the apartment on the ground floor on the north side of the building was occupied by the building janitor.

Again in rebuttal the complainant testified that she had

never lived on the first floor of the apartment building at 6617 South Stewart, nor did she have a key to any apartment on that floor. Complainant further testified that her mother lived with her continuously.

In his summation of the testimony and his reasons for his finding, the trial judge indicated that he did not believe the complainant was a prostitute, that his opinion was that she had made a good witness, whereas the defendant gave the judge the impression of being ill at ease and his story illogical. The judge pointed out, in making his finding of guilty, the errors and discrepancies in defendant's testimony and statements regarding the location of complainant's apartment, indicating that he believed the defendant was not telling the truth.

While, as we have pointed out in this opinion, the testimony is irreconcilably conflicting, neither version of this occurrence is so inherently improbable as to be unworthy of belief. It is true that some of the circumstances testified to by complainant seem somewhat unlikely, but it is uncontroverted that defendant made conflicting statements as to the location of complainant's apartment, all of which were in error. While some variation in this respect might be insignificant, it is difficult to believe defendant would testify to the presence of complainant's apartment on the first floor when it was actually on the fourth floor if he had been in it as he claimed. In addition, the officers testified that, when arrested, defendant maintained he had paid complainant $2 at the time of intercourse and then subsequently snatched the $2 back and ran from the apartment. At the trial defendant testified he paid complainant $4, and she tried to snatch an additional $10 from his hand. Under this set of circumstances, with the opportunities for observation as enjoyed by the trial court, this case is a particularly appropriate one for the application of the rule that we will not disturb the findings of the trier of fact unless the proof is so unsatisfactory or implausible

as to justify a reasonable doubt as to defendant's guilt. *People* v. *Crenshaw*, 15 Ill.2d 458, 468.

We believe the finding of the trial court was warranted by the evidence, and the judgment of the criminal court of Cook County is therefore affirmed.

*Judgment affirmed.*